# LAW OFFICE OF MICHAEL A. LEE

**CLIENTS:**   Mr. Nguyen Van Binh, President/Owner, Thabico
Manufacturing, Ltd., ngocnga@thabico.com
Mr. Duc Nguyen, President/Owner Triumph Wood
Product, Inc., hs.triumph@yahoo.com
Ms. Kim Chi Nguyen, US Representative Thabico,
kchinguyen@icloud.com
Mr. Chau T. Long, Adviser Thabico & Triumph,
longtchau@gmail.com
Mr. Van Cong Trang, Partner/Owner, Thabico,
[no email]

**ATTORNEYS:**   Michael A. Lee, Lead Counsel, comlaw@me.com , Law
Office of Michael A. Lee, STATE BAR NO. 12074620

Kristopher Rabie, Partner, krisrabie@vmrlawfirm.com ,
Valore, Murphy & Rabie, PLLC
Beverly Valore, bvalore@vmrlawfirm.com (not currently
licensed in Texas, New Jersey Bar No.

**DATE:**   November 9, 2017

**RE:**   STATUS MEMO CAUSE NO. 2015-39624

---

### INITIAL CONTACT

Kristopher Rabie, a friend and colleague, called me in late June of 2015 to see if I would

serve as lead counsel, with his help, on what he described as a "somewhat complicated case

involving the unsuccessful purchase of a $1.2 million crane."   Triumph Wood Product Inc.

("Triumph") based in Texas was acting on behalf of a major company in Vietnam, ("Thabico") to purchase a large crane with unique capabilities, owned and in the possession of Kiewit Offshore Services, Ltd. ("Kiewit") in Corpus Christi Texas.  I agreed to prepare a proposed attorney fee contract, and meet with Triumph's representative, Mr. Sonny Nguyen[1], later that week.  At the meeting, Sonny and Kris carefully walked me through the basic facts underlying the dispute in great detail.  Sonny was extremely helpful in answering our questions and providing verification and support for various statements of facts or allegations made by Triumph, on behalf of Thabico.

According to Sonny, the original plan was for funds originating from Thabico were supposed to have been used to secure the purchase of a crane by Triumph for the benefit of Thabico.  Once the purchase from a United States source occurred, Triumph would take the necessary steps to have the crane shipped, packed, and delivered to Thabico in Vietnam.

Sonny next provided us with critical evidence indication that a fraud was in the process of occurring in the form of a series of text messages, attachments and photos that he was able to recover from his mobile phone.  As set forth in painstaking detail in the Plaintiff's Original Petition, these documents allowed us to make detailed and forceful allegations of misconduct and fraud by various defendants, including, Maze Express, LLC, B.R. Crane and Equipment LLC, D&H Earth Movers, and to a lesser extent, Kiewit Offshore Services, Ltd., as set forth in the *Plaintiff's Original Petition, Application for Temporary Restraining Order, and Expedited Discovery*,  to initiate the case before loosing control over the crane, and Thabico's stolen funds.[2]

---

[1] Mr. Sonny Nguyen was replaced by Mr. Duc Nguyen, as the official representative of Triumph, and signed an updated fee agreement around September 23, 2015 agreeing to jointly prosecute the case with Thabico.

[2] For a complete and detailed explanation of the facts alleged, see Plaintiff's Original Petition, Application for Temporary Restraining Order, and Expedited Discovery, at the following link, https://www.sugarsync.com/pf/D0965459_05686159_062925

**CLIENT OBJECTIVES AND INSTRUCTIONS**

From the outset, Sonny asked us to commit our maximum resources to this case because time was of the essence.  He explained that Thabico required the particular crane in Corpus Christi Texas as soon as possible in order to meet Thabico's contractual obligations arising from a major project ongoing in Vietnam.  The precise name of the Corpus Christi crane owned by Kiewit is a 2500 Demag CC Serial No. 59010 (the "Crane").  Thabico's contract in Vietnam is worth more than $8,000,000 to Thabico.  Failure to perform on time by Thabico triggered one delay penalty of more than $70,000 and has likely triggered additional fines.

Sonny emphasized that Thabico's primary goal in the case was to ensure that the Crane is loaded on a vessel, headed for Vietnam, as soon as possible.  Although we fully discussed potential damage claims against various parties, they were considered secondary.  As part of the initial strategy, we discussed how to approach various parties, and in particular, Kiewit reardign the allegations set forth in the Original Petition.  Sonny encouraged us to be open to settlement talks and negotiations, if doing so would achieve the main goal of gaining possession for Thabico in a timely manner.

**OBTAIN TRO VIA EVIDENCE AND AFFIDAVITS FROM SONNY**

After acquiring a thorough knowledge of the facts, our next step was to bring as much pressure to bear against Kiewit, the party in possession of the Crane.  We needed to file something as quickly as possible to make sure Kiewit did not dispose of the Crane before our complaints could be heard by a court.

However, at the beginning of the dispute, Kiewit appeared to be the least culpable of the defendants, and the hardest to state a strong legal claim against.  If they had not been in possession with the Crane, we might have recommended against suing Kiewit originally, but

3

since the Crane was, in fact in Kiewit's possession, we had to come up with a theory that would make Kiewit answer for the conduct of others who we believed to be in the course of committing a serious fraud.

Of course, from the start of this dispute, Kiewit argued, with some credibility at first, that it was simply and "innocent party" holding what it believed to be a "legitimate" down payment from a potential purchaser.  So, in order to establish a good faith claim against Kiewit and obtain an injunctive order from the Court mandating that the Crane not be sold, moved, or shipped from it present location in Corpus Christi, Texas, we had to establish a record of compelling, clear, and direct admissible evidence proving that Kiewit was not  just an "innocent" party holding a down payment.   Instead, we alleged that we had good reasons to believe that Kiewit was knowingly holding stolen funds, that actually belonged to Thabico.

Once again, Sonny, came through with certain basic, but persuasive evidence tending to show an ongoing fraud in progress.  Specifically, he kept all of his text messages communicating with the defendants, and was able to print out photos and attachments to those text messages. Put together, in the proper sequence, and supplemented by his own affidavit, I believed we had enough evidence to allege that B.R. Crane, in conspiracy with others, used Triumph's funds as part of a fraudulent scheme to acquire the Crane from Kiewit. That being said, because the entire case depended upon making a record of admissible evidence sufficient to convince a judge to grant extraordinary emergency injunctive relief depriving Kiewit of an asset worth more than $1,000,000 for an unlimited time, I knew we needed additional evidence to support our theory if we would have any chance to succeed at the upcoming Temporary Injunction hearing.

**FIRST STEP, GET THE TEMPORARY RESTRAINING ORDER**

We learned from Sonny that his sources indicated that various entities were just about ready to load the Crane on a ship bound for India any day, or in fact any hour.  Once on board, the Crane would be beyond our reach, and as a practical matter, any hope of recovering the funds stolen from Triumph and Thabico would be much more difficult, if not impossible.

Given the threat of imminent danger, along with the background set forth above, we decided on one of the fastest, and most aggressive legal strategies available.  Since it was the only strategy that allows the plaintiff to obtain relief BEFORE actually going through an entire trial, it was exactly what our client's needed.  Unfortunately, it is also one of the hardest things to achieve, short of winning a final jury trial, it was really the only possibility in light of the circumstances to protect the clients from a total loss.  Filing of the TRO, if successful, would provide us with a freeze of the Crane for only two weeks, before a much more difficult test, called a Preliminary Injunction Evidentiary Hearing, but it did allow for the possibility of a settlement or resolution during the two week cooling off period the Court would order, if we won.

Although the initial TRO is a non-evidentiary hearing, it is best to present some evidence in the form of affidavits and documents if at all possible.  The Plaintiff is allowed to chose the date for applying for the TRO, which allowed us to intensively prepare for the TRO hearing prior to actually notifying Kiewit and the other defendants.  That is a big advantage of using the TRO as it gives your client the benefit of surprise, which we used to maximum effect.

After weeks of intense secret preparation, on July 10, 2015, Triumph filed its Original Petition and obtained an emergency expedited hearing on its Application for a Temporary Restraining Order.  The proposed TRO lasts only 14 days, but if granted, it would freeze the Crane in place long enough to allow Triumph and Kiewit, to negotiate in good faith.  Although

the risk of failure was large, it was the only strategy that would guarantee a short freeze of the Crane against Kiewit's wishes while keeping the Crane available for ultimate purchase by Thabico.  If Triumph's request were denied, it would have virtually no leverage to negotiate with Kiewit or anyone else, but given the circumstances, it was a risk worth taking.

On the same day we filed the Original Petition, July 10, 2015, Judge Jeff Shadwick of the 55th District Court, granted our request for emergency hearing, and after considering our argument and Kiewit's response, and that of BR Crane as well, Judge Shadwick found that Triumph met its burden and was entitled to an immediate Temporary Restraining Order against Kiewit, for 14 days.

To my surprise, the lawyers representing Kiewit and BR Crane waited after the TRO hearing to discuss settlement of the case.  I was surprised because we had so thoroughly prepared and defeated them, I thought they would just leave the courtroom with their heads down.  After a very brief conversation, I made it crystal clear, that we  viewed this as a clear case of theft, and that no matter what Kiewit claimed, it was guilty for holding stolen funds. No one had anything to say by way of defense or offered to engage in further settlement discussions.

To my surprise, counsel for Kiewit acted like nothing happened, ignored my emails and calls, and eventually sent a letter to Triumph full of unreasonable demands, including a demand for the full price of the Crane without credit for the stolen funds belonging to Thabico it held. After discussion with Triumph regarding Kiewit's position, he confirmed that Thabico would not pay double for the Crane.  He advised us to move forward to establish evidence to support the upcoming Temporary Injunction hearing set two weeks later.

**KIEWIT REFUSES TO NEGOTIATE.**

However, as it turned out, Kiewit refused to even engage in any type of settlement negotiations during the 28 days that allowed for the parties to negotiate.  To our disappointment and surprise, the Defendants acted as if the TRO was meaningless, and that they would be able to wait 14, then the 28 days it remained in force, before closing the sale to BR Crane. Undoubtedly, the defendants believed that Triumph would no be able to prepare and present the required, and  evidentiary for a Temporary Injunction, or TI.  The main differences between a TRO and an TI are, 1) the amount of admissible evidentiary proof required, and 2) the length of time it remains in force.   So, although a TRO is relatively easy to obtain by showing some evidence of irreparable injury, the TRO only lasts 14 days at most.  By contrast, a TI requires sufficient admissible evidence to show that the Plaintiff's underlying legal claims set forth in the lawsuit petition are meritorious.  Also, rather than 14 days, a TI, theoretically lasts as long as it takes to try the Plaintiff's claims, which routinely takes, 2, 3, 4, or even 5 years and longer to achieve.

Thus, the granting of a TI in the case, created a substantial legal advantage for Triumph and Thabico.  It means that as long as Triumph and Thabico insist on being treated fairly now that everyone realizes that Kiewit was about to sell the Crane to a buyer ***using Thabico's funds,*** Kiewit is subject to a fully enforceable court order mandating that it maintain the Crane at its yard, protecting it from damage, and bearing all costs associated with the Crane until this case goes to trial.  If that takes 3 more years, it means that Kiewit will also accrue damages for any injuries its conduct causes between now and a trial by jury, whenever that occurs.

to obtain from the Court first 14 day  and If we could then persuade the Court to extend that freeze via competent evidence showing that Triumph had a meritorious claim, then the "freeze" would continue in place until the dispute with Triumph gets finally resolved by a jury in trial. that would prevent the current owner of the Crane from selling, offering to sell, moving, encumbering, or allowing any lien's on the Crane while the claims by Triumph remain unresolved.

To make that happen, Triumph immediately faced a very tough decisions in the face of considerable uncertainty and doubt, namely, would Triumph be able or willing to put up a bond that would probably be in the amount of several hundred thousand dollars, and very likely $1,000,000.  Failure to do so would have resulted in the dismissal of the equitable claims forever.

To make matters worse, no case directly on point answers the question under Texas law.  As  a result, the best advice I could provide Triumph was to be prepared for another $500,000 in bond above the nominal bond we previously posted for the TRO.

During the final evidentiary hearing before our Judge, she stated in open court that although she had not made up her mind about whether to grant the injunction, she was fairly certain that would require Triumph to post an additional $425,000 for the bond.  Thankfully, after hearing our evidence, and considering my closing argument, and discussion of Texas cases which mentions the trial Judges role in determining the bond amount, the Judge not only granted the injunction just as we asked, but completely changed her mind about the amount of the bond.  She rejected the defendants' request for a $1,000,000 bond, and even her preliminary announced bond amount of $425,000.  Instead, she agreed with my request during closing arguments to

leave the bond at just $5,000, which is what we already posted when we obtained the earlier Temporary Restraining Order.

 In  could it, and was it worth it, to post, what in all likelihood would be a security bond in the amount of $1,000,000.    and, more importantly, worked closely with its attorneys as we all "dropped everything" and commit the substantial resources required to build the type of detailed evidentiary record required by Texas courts before awarding the extraordinary injunctive relief sought by Triumph.

### Prepare for critical TI evidentiary hearing

Proving that a client is entitled to a pre-trial order taking control of an opponent's property requires extraordinary effort.  Sometimes it is worth the risk.  By resolving a key issue early, parties often reach a final and complete compromise or resolution.  That is precisely what we hoped to accomplish here.  Protect the prize (the Crane) sought by the client, while resolving an underlying key factual dispute, ("were stolen funds used to pay down on the Crane?").

Because deadlines are shortened, and the burden of proof for injunctive relief is somewhat lower than for a final judgment, we used those facts to our advantage by asking the Court to help Triumph bolster the evidentiary record.  Specifically, at the same time we filed the Original Petition, and Application for Emergency TRO, we also sought an Emergency Order forcing the defendants, and more importantly, their banks and financial institutions to respond to very narrow and specific document requests, within the time periods contemplated by the Rules for

TROs, rather than the much longer time to respond allowed under normal circumstances.   The key part of the plan involved a series of subpoenas we issued to the banks for Maze, B.R. Crane, and of course, Kiewit.  Knowing that the defendants' banks would seek delays and assert bogus objections to run the clock,  we asked the Court to include a specific Order that narrowed the kind and number of documents the banks would have to produce, but required production of critical bank statements and deposit records within 10 days, or just **_one day before_** the parties evidentiary hearing on the Temporary Injunction.  As a result, I was able to offer and admit a substantial evidentiary record, to supplement the initial record, and more than that, cast serious doubt on Kiewit, and its hollow cries of innocence.

Had Kiewit been able to complete the sale of the Crane, it would have been boxed and loaded on a ship headed for India, beyond the reach of Triumph, Thabico, and the entire US Court system.[3] not to mention  damages suffered by Triumph and Thabico, depended upon Triumph's authorization, support, and  immediate extra-ordinary the trial team reached a clear and unanimous, although challenging  it became clear that any chance of regaining possession of the Crane,  depended on Triumph's immediate authorization, support, and assistance with the preparation and filing of a series of extraordinary legal steps at the same time.  Had Triumph failed to authorize and support our proposed strategy, several companies and individuals, working together against Thabico's interest, were prepared to wrongfully take possession of the

---

[3] In fact, the day of the final evidentiary hearing to determine whether to grant our request to freeze the Crane at its current location, we learned that Kiewit and BR Crane had been "standing by" awaiting the Court's decision.  Had the Court ruled against us, instead of for us on all grounds we sought, the Crane would have been loaded on board a vessel the next morning and Triumph  and Thabico would be powerless to negotiate with Kiewit regarding possession of the Crane.

Crane and prepare it for shipping to India, and thereby beyond the reach of Thabico, or the US

Court system.

 us to prepare, file and present a series of emergency and extraordinary preliminary r for

immediate temporary and would be necessary to enable Triumph to meetings with Mr. Rabie, we

learned that unless we instituted emergency extraordinary legal actions against various parties,

the chances of actually recovering the Crane, not to mention, recoverable damages from potential

defendants who would have caused those damages l recovery of the Crane, and damages

sustained as a result of various unnamed defendants  absent immediate actions, the underlying

claims were in serious danger of b

### Adding Individual Defendants

Thao Duong, Bangh Nguyen, and Rahim Rashwani, could have been added as named

defendants.  We chose not to add them initially for reasons that we can discuss at our meeting.

The bottom-line is that each of the above can be added to the law suit based on the evidence we

have developed.  Although it is doubtful that any of the above has the resources necessary to

respond to a final judgment awarding damages in this case.  Despite that, there may be other

reasons of which I am not aware that militates in favor of adding them as named defendants to

the case.